IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **Case No. 3:23-cr-00209-N-9** |
| | ) | |
| Plaintiff, | ) | Dallas, Texas |
| | ) | June 26, 2023 |
| v. | ) | 10:00 a.m. |
| | ) | |
| KEYSHAWN JA'MOND JEFFERSON, | ) | INITIAL APPEARANCE RE: |
| | ) | REVOCATION OF PRETRIAL |
| Defendant. | ) | RELEASE |
| _____ | ) | |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE RENEE HARRIS TOLIVER,
UNITED STATES MAGISTRATE JUDGE.

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | Gary C. Tromblay |
| | UNITED STATES ATTORNEY'S OFFICE |
| | 1100 Commerce Street, Suite 300 |
| | Dallas, TX  75242-1699 |
| | (214) 659-8600 |
| | |
| For the Defendant: | Ezekiel Tyson, Jr. |
| | TYSON LAW FIRM, PLLC |
| | 942 W. Montana Avenue |
| | Dallas, TX  75224 |
| | (214) 942-9000 |
| | |
| For U.S. Probation and Pretrial Services: | Officer Barnes |
| | |
| Court Recorder: | Mervin Wright |
| | UNITED STATES DISTRICT COURT |
| | 1100 Commerce Street, Room 1611 |
| | Dallas, TX  75242-1003 |
| | (214) 753-2169 |
| | |
| Transcribed by: | Kathy Rehling |
| | 311 Paradise Cove |
| | Shady Shores, TX  76208 |
| | (972) 786-3063 |

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

| | |
|---|---|
| 1 | DALLAS, TEXAS - JUNE 26, 2023 - 10:11 A.M. |
| 2 | THE COURT:  The Court next calls Case No. 3:23-cr- |
| 3 | 209-N, United States of America versus Keyshawn Ja'Mond |
| 4 | Jefferson. |
| 5 | MR. TROMBLAY:  Gary Tromblay for the Government. |
| 6 | THE COURT:  Thank you. |
| 7 | MR. TYSON:  Ezekiel Tyson on behalf of Mr. |
| 8 | Jefferson. |
| 9 | THE COURT:  Thank you. |
| 10 | MR. TYSON:  This is Mr. Jefferson. |
| 11 | THE COURT:  And, sir, you are Mr. Jefferson, then? |
| 12 | THE DEFENDANT:  Yes, ma'am. |
| 13 | THE COURT:  Mr. Jefferson, you're here because the |
| 14 | Court received a report of violation of conditions of release |
| 15 | in your case alleging that you violated certain conditions of |
| 16 | pretrial release that I ordered in your case. |
| 17 | Have you had an opportunity to go over that report of |
| 18 | violation of conditions of pretrial release with Mr. Tyson? |
| 19 | THE DEFENDANT:  Yes, ma'am, I did. |
| 20 | THE COURT:  And has he also shared with you the |
| 21 | motion to revoke pretrial release conditions that's been |
| 22 | filed in your case? |
| 23 | THE DEFENDANT:  Yes. |
| 24 | THE COURT:  And are you all ready to proceed, Mr. |
| 25 | Tyson? |

1          MR. TYSON:  Yes, Your Honor.

2          THE COURT:  And Mr. Tromblay, are you ready to

3  proceed on behalf of the United States?

4          MR. TROMBLAY:  Yes, ma'am.

5          THE COURT:  And Mr. Tyson, having discussed this

6  matter with Mr. Jefferson, can you advise the Court how he

7  intends to proceed on the allegations?

8          MR. TYSON:  Your Honor, he believes that he's

9  proceeding on a plea of not true.

10         THE COURT:  Okay.  Then you all can have a seat,

11  then, and we'll go forward.

12    Mr. Tromblay?

13         MR. TROMBLAY:  Your Honor, the Government is going

14  to call Sam Levy.

15         THE COURT:  Thank you.

16         MR. TROMBLAY:  And Your Honor, I have three exhibits

17  that I intend on introducing.  Mr. Tyson, Mr. Ezekiel Tyson,

18  has been given copies of these.

19         THE COURT:  Thank you.

20    (The witness is sworn.)

21         THE COURT:  You may proceed, Mr. Tromblay.

22         MR. TROMBLAY:  Thank you, Your Honor.

23           SAM LEVY, GOVERNMENT'S WITNESS, SWORN

24              DIRECT EXAMINATION

25  BY MR. TROMBLAY:

Levy - Direct                                    4

1    Q    Good morning.

2    A    Good morning.

3    Q    Would you state your name for the record, please?

4    A    Sam Levy.

5    Q    All right.  And Mr. Levy, how are you employed?

6    A    I'm a U.S. Probation and Pretrial Services officer.

7    Q    Okay.  And that's here in the Northern District of Texas?

8    A    Yes.

9    Q    All right.  How long have you been employed by U.S.

10   Probation?

11   A    Approximately three and a half years.

12   Q    Okay.  Are you familiar with the case United States of

13   America versus Keyshawn Ja'Mond Jefferson, Case No. 3:23-cr-

14   209?

15   A    Yes.

16   Q    Okay.  And how did you become involved in this particular

17   case?

18   A    I was assigned to supervise Mr. Jefferson on pretrial

19   supervision.

20   Q    Okay.  And it's my understanding that Mr. Jefferson was

21   indicted for a felony firearm offense; is that correct?

22   A    Yes.

23   Q    Okay.  And that he was given conditions of release?

24   A    Yes.

25   Q    Okay.  And when did his -- when was he released on

Levy - Direct                              5

1   conditions?

2   A    June 5, 2023.

3   Q    Okay.  And for the record, do you see Mr. Jefferson in

4   the courtroom?

5   A    Yes, I do.

6   Q    Okay.  You've had an opportunity to meet with him?

7   A    Not today.

8   Q    Okay.  But before?  After -- either before his release or

9   after his release?

10  A    Yes.

11  Q    Okay.  And do you see him in the courtroom?

12  A    Yes, I do.

13  Q    Okay.  Could you identify him for the record, please?

14  A    He's wearing a brown jumpsuit.

15  Q    Okay.  And he's the gentleman seated with Mr. Ezekiel

16  Tyson at the defense table?

17  A    Yes.

18        MR. TROMBLAY:  Your Honor, let the record reflect

19  that the witness has identified the Defendant.

20        THE COURT:  The record will so reflect.

21        MR. TROMBLAY:  Okay.

22  BY MR. TROMBLAY:

23  Q    Prior to Mr. Jefferson being released on June the 5th,

24  was a Pretrial Services report conducted?

25  A    Yes.

Levy - Direct                                              6

1   Q   Okay.  And as part and parcel of the Pretrial Services

2   report, did that information also concern the Defendant's

3   drug use history?

4   A   Yes.

5   Q   Okay.  And was he specifically asked whether or not he

6   used any type of controlled substance?

7   A   Yes.

8   Q   Okay.  And what was his response?

9   A   His response was that he used marijuana monthly, with his

10  last use six months ago.

11  Q   Okay.  So when did he indicate was the last time that he

12  had used marijuana?

13  A   Six months ago.

14  Q   And that was an interview conducted when?

15  A   On June 5, 2023.

16  Q   Okay.  So he indicated to U.S. Probation the last time

17  that he had used marijuana was almost six months earlier?

18  A   Yes.

19  Q   Okay.

20          MR. TROMBLAY:  And Your Honor, I would also ask the

21  Court to take judicial notice of the Pretrial Services report

22  in this matter.

23          THE COURT:  Yes.

24  BY MR. TROMBLAY:

25  Q   Following Mr. Jefferson's release, did you have the

Levy - Direct                                    7

1   opportunity to do what's called an intake appointment?

2   A    Yes.

3   Q    And when did that occur?

4   A    On June 7, 2023.

5   Q    Okay.  And where did that occur?

6   A    At the U.S. Probation and Pretrial Office in Dallas,

7   Texas.

8   Q    Here in this building?

9   A    Yes.

10  Q    Okay.  Whenever you interviewed -- did -- whenever Mr.

11  Jefferson appeared, did you ask him whether or not he was in

12  possession of any firearms?

13  A    Yes.

14  Q    And was one of the conditions that Judge Toliver placed

15  on him that he not possess any firearm?

16  A    Yes.

17  Q    Okay.  When you questioned him about his ownership of

18  firearms, did he indicate to you that he had owned a firearm?

19  A    Yes.

20  Q    Okay.  Now, on June 5th, he had been given conditions of

21  release by Judge Toliver?

22  A    Yes.

23  Q    And he signed those, indicating that he understood those

24  conditions?

25  A    Yes.

1    Q    And one of those conditions was, on June the 5th, that he

2    not possess any firearms as a condition of his release?

3    A    Yes.

4    Q    Okay.  So on June 7th, whenever you met with him two days

5    later, did he indicate whether or not he had owned a gun?

6    A    Yes.  He did.

7    Q    Okay.  What kind of gun did he say that he owned?

8    A    A Glock 19.

9    Q    Okay.  And did you ask him where that gun was?

10   A    Yes, I did.

11   Q    And what was his response?

12   A    He advised me that he had surrendered the Glock 19 to his

13   friend Jalen Robinson's father the previous day, on June 6,

14   2023.

15   Q    Okay.  Before you, marked for identification, is

16   Government Exhibit #1.  What is Government Exhibit #1?

17   A    That is a firearm statement.

18   Q    Okay.  And it contains the case caption of this case?

19   A    Yes.

20   Q    Okay.  And it says the type of weapon?

21   A    Yes.

22   Q    Glock 19?  And it says the party to whom it was

23   surrendered?

24   A    Yes.  Jalen Robinson father, surrendered on June 6, 2023.

25   Q    Okay.  So he indicated to you that he had this gun but

Levy - Direct                                                9

1    that he had given it to Jalen Robinson's father the day

2    before he met with you?

3    A    Yes.  Verbally and in writing.

4    Q    Okay.  And he was clear about that?

5    A    Yes.

6    Q    Okay.  And he signed it?

7    A    Yes.

8    Q    And he dated it June 7, 2023?

9    A    Yes.

10   Q    And it's also signed by you?

11   A    Yes.

12   Q    Okay.

13            MR. TROMBLAY:  Your Honor, at this time I move to

14   introduce into evidence Government Exhibit #1.

15            THE COURT:  Any objection?

16            MR. TYSON:  No objections to Government 1.

17            THE COURT:  It's admitted.

18            MR. TROMBLAY:  Okay.

19       (Government's Exhibit 1 is received into evidence.)

20   BY MR. TROMBLAY:

21   Q    During your intake interview with the Defendant, did you

22   tell him after he had given you this information that you

23   would be following up with Jalen Robinson's father to confirm

24   whether or not he had actually surrendered this pistol as he

25   had indicated to you?

1    A    Yes, I did.

2    Q    And whenever you told him that you would be doing follow-

3    up, did his story about this -- about this pistol change?

4    A    Yes, it did.

5    Q    Okay.  And was it a material change?

6    A    Yes.

7    Q    How it is material and how did it change?  Well, how --

8    how did it change and how did -- how was it material?

9    A    So, Mr. Jefferson was comfortable with his answer that he

10   surrendered it to his friend's father for about an hour after

11   he signed the initial firearm statement.  Towards the end of

12   the intake, he changed his answer and he told me that he was

13   not truthful, he still possessed a Glock 19, and he was

14   planning to surrender it to his girlfriend, Mariah Wilson.

15   Q    Okay.  So, when confronted with the fact that he -- that

16   you were going to follow up with the information that he gave

17   you verbally and in writing, he then changed his story?

18   A    Yes.

19   Q    Okay.  And would you take a look at Government Exhibit

20   #2?  What is Government Exhibit #2?

21   A    That is a firearm statement.

22   Q    Okay.  Is it the same form?

23   A    Yes.

24   Q    Okay.  Is it the same form as Government Exhibit #1?

25   A    Yes.

1    Q    Same thing?  Except there's been an alteration to it?

2    A    Yes.

3    Q    And what is the alteration?

4    A    Mr. Jefferson crossed out that he surrendered the weapon

5    to Jalen Robinson's father on June 6, 2023.  He then

6    indicated Mariah Wilson and provided her phone number.

7    Q    Okay.  So he stated that Mariah Wilson was whom in

8    relation to him?

9    A    His girlfriend.

10   Q    Okay.  And that he was going to give the gun to her?

11   A    Yes.

12   Q    Okay.  He even provided her phone number?

13   A    Yes.

14   Q    Okay.  Was that the only material misstatement of fact

15   that Mr. Jefferson gave to you that day?

16   A    On that day, yes.

17   Q    Did he give you another -- did he give -- did he change

18   his story about another -- about another aspect of his

19   pretrial -- conditions of pretrial release?

20   A    Yes.  About the marijuana?

21   Q    All right.

22   A    He changed his answer that he had used it initially six

23   months ago, he changed that to he had used marijuana on June

24   4, 2023 after he was served a summons for his federal

25   criminal case.

1  Q   Okay.  What made him change his story?  He initially said

2  that he had last used marijuana six months before, six months

3  earlier; now he's saying that he used it the day before his

4  initial appearance.

5  A   I advised him that I would be doing a drug test.

6  Q   Oh, okay.  So just like when you confronted him with the

7  fact that you were going to do a follow-up about his

8  statement about the firearm, when you told him that you were

9  going to do -- that you were going to conduct a drug test on

10  him, his story changed?

11  A   Yes.  Correct.

12  Q   Okay.  Now, let's fast forward to two days later, on June

13  9th of 2023.  Did you ever conduct -- did you ever

14  telephonically contact Mariah Wilson at the phone number that

15  the Defendant gave you?

16  A   Yes.

17  Q   Okay.  And what was the purpose of that phone call?

18  A   To verify that she possessed Mr. Jefferson's Glock 19.

19  Q   Okay.  And what did she say?

20  A   She without hesitation confirmed she was in receipt of

21  his Glock 19.

22  Q   And she said she had it?

23  A   Yes.

24  Q   Okay.  And did you do anything to test her veracity, to

25  see whether or not she in fact had that gun?

Levy - Direct                                    13

```
 1    A    I requested the serial number, and without hesitation Ms.

 2    Wilson immediately cited a nine-digit serial number for the

 3    Glock 19.

 4    Q    She gave you a nine-digit serial number?  Do you have

 5    that serial number handy?

 6    A    I do.

 7    Q    What is the serial number that she gave you?

 8    A    A017195A1.

 9    Q    5A1?  So A017195A1?

10    A    Yes.

11    Q    And she indicated that that was the serial number for the

12    Glock pistol that she had?

13    A    Yes.

14    Q    Okay.  Now, taking that information, did you do anything

15    with that serial number that she provided you?

16    A    I ran it through the National Crime Information Center

17    firearms database, and no results were received, matching

18    results.

19    Q    So the serial number that she gave you for the gun that

20    she said that she had, it didn't come back through NCIC?

21    A    Yes.  Correct.

22    Q    Okay.  June 12, 2023.  Whenever you met with the

23    Defendant, Mr. Jefferson, did you have his home address?

24    A    Yes.

25    Q    And what was his home address?
```

Levy - Direct                                    14

1    A    324 Edward Drive, Arlington, Texas 76002.

2    Q    Okay.  On June the 12th of 2023, did you ever decide that

3    you were going to do a home inspection concerning this

4    residence?

5    A    Yes.

6    Q    Okay.  And about what time did you go there?

7    A    Approximately 12:00 p.m.

8    Q    Okay.  Did Mr. Jefferson know that you were coming?

9    A    He did not, no.

10   Q    Okay.  Why'd you surprise him?

11   A    Because he had a history of not being truthful, and by

12   surprising him there would be the possibility that I would

13   find something of concern.

14   Q    Okay.  So, whenever you arrived at the residence, did you

15   knock at the door, ring the doorbell?  How did you announce

16   yourself?

17   A    I knocked at the door.

18   Q    Okay.  Did you announce who you were?

19   A    I did, yes.

20   Q    Okay.  And did you know whether or not Mr. Jefferson was

21   home whenever you knocked and announced?

22   A    I did not know if he was specifically home, but I saw two

23   other individuals walk into the residence right before I

24   knocked on the door.

25   Q    Okay.  So I'm sure that the door was opened immediately

1    for you once you knocked and announced, right?

2    A    I had to wait approximately four to five minutes.

3    Q    Oh, okay.  Did that give you some concern?

4    A    It did, yes.

5    Q    Okay.  Whenever the -- who opened the door for you after

6    a four/five-minute wait?

7    A    Mr. Jefferson.

8    Q    Oh, okay.  So he opened the door?

9    A    Yes.

10   Q    Okay.  And did he appear to be surprised to see you?

11   A    He did, yes.

12   Q    Okay.  Did you ask to come inside the residence?

13   A    Yes.

14   Q    Okay.  And did he allow you in?

15   A    He did, yes.

16   Q    Okay.  While you were inside the residence, did any type

17   of odor strike you?

18   A    Yes.  When I entered Mr. Jefferson's designated bedroom,

19   there was a strong odor of marijuana.

20   Q    Okay.  So, inside his bedroom, there was a strong odor of

21   marijuana?

22   A    Yes.

23   Q    Okay.  Whenever you say strong odor, I know that

24   sometimes strong can be subjective, but what is it that you

25   mean?  Describe it to the Court.

1   A    From walking throughout the other spaces of the

2   residence, the odor was strongest in Mr. Jefferson's room, so

3   that appeared to be where the marijuana was coming from.

4            MR. TYSON:  I'm going to object to speculation, Your

5   Honor.

6            MR. TROMBLAY:  He can testify about what his senses

7   told him.

8            THE COURT:  Overruled.

9            MR. TROMBLAY:  Okay.

10  BY MR. TROMBLAY:

11  Q    But the odor was coming from his bedroom?

12  A    Yes.  That's where it was strongest.

13  Q    All right.  Did you confront him with this fact, saying,

14  look, I'm smelling marijuana here?

15  A    Yes.

16  Q    Okay.  What was his response?

17  A    He initially indicated that it was an odor from when he

18  used to use marijuana --

19  Q    Okay.

20  A    -- and it was still present in his residence.

21  Q    All right.  Did his story about that change?

22  A    It did.  Towards the end of the assessment, he advised me

23  that the odor was from his family, who uses marijuana.

24  Q    Okay.  So, first, it was this is me but this is from long

25  ago, and now, yes, it's fresh, but it's from my family?

1    A    Yes.

2    Q    Okay.  Also inside his bedroom, did you see anything that

3    would indicate to you any sort of paraphernalia that would be

4    used to smoke marijuana or consume any other type drug?

5    A    I did, yes.

6    Q    What did you see?

7    A    I saw numerous cigarillo wrappers, there was used

8    marijuana roaches on the floor, there was burnt residue on

9    various surfaces, and there was a substantial amount of

10   lighters.

11   Q    Okay.  Now, you're aware that this is a firearm case?

12   A    Yes.

13   Q    Did you see anything inside his bedroom that would give

14   you concern about firearms?

15   A    I did, yes.

16   Q    What did you see?

17   A    I saw numerous holsters.  I saw a briefcase safe.  I saw

18   several bolt locks.  I saw various types of wrapping and

19   products related to firearms throughout his bedroom.

20   Q    Okay.  Did you ask him about that?

21   A    I did, yes.

22   Q    What was his response?

23   A    He had told me that the accessories are old and that he

24   just forgot to get rid of them.

25   Q    Okay.  Did you ask him again about the Glock 19?

1    A    I did, yes.

2    Q    What was his story?

3    A    He indicated that he had given it to his girlfriend,

4    Mariah Wilson.

5    Q    All right.  Now, you didn't search the residence, did

6    you?

7    A    No.

8    Q    You didn't have that authority?

9    A    No.

10    Q    Okay.  June 15th.  Did you contact Mariah Wilson again?

11    A    Yes.

12    Q    Okay.  What was the purpose of that?

13    A    I requested a photo of Mr. Jefferson's firearm.

14    Q    Okay.  And did she -- did she provide you with a

15    photograph of the gun that she claimed that she had?

16    A    She did, yes.

17    Q    Okay.  How did she provide it to you?

18    A    It was a photo --

19    Q    Yeah.  Take a look at Government Exhibit #3.  What is

20    Government Exhibit #3?

21    A    It looks like a -- a handgun on some type of soft, almost

22    a mattress surface.

23    Q    Okay.  And who provided you with that photo?

24    A    Mariah Wilson, Mr. Jefferson's girlfriend.

25    Q    And it came from the -- from the -- from the -- how did

Levy - Direct                                         19

1  she send it?  By text or --

2  A    She sent it via text message.

3  Q    Okay.  From the same phone number that Mr. Jefferson had

4  provided you?

5  A    Yes.

6  Q    Okay.  Once you received that photo from Ms. Wilson, did

7  you have your suspicions?

8  A    I did, yes.

9  Q    Okay.  And what steps did you take to verify the

10 authenticity of that particular photograph?

11 A    Because the photo was sent using an Apple product, I was

12 able to look at the photo details.  The photo details reflect

13 the photo was taken on June 8, 2023 at 11:04 a.m. at Mr.

14 Jefferson's designated residence located at 324 Edward Drive,

15 Arlington, Texas 76002.

16 Q    Okay.  So that's what the metadata -- that's what the

17 metadata showed?

18 A    Yes.  Correct.

19 Q    Okay.  That it was taken on June 8, 2023 at 11:04 a.m. at

20 Mr. Jefferson's residence in Arlington?

21 A    Yes.  Correct.

22 Q    Okay.

23        MR. TROMBLAY:  Your Honor, at this time I also move

24 to introduce, if I haven't already done so, Government

25 Exhibits 2 and 3.

1          THE COURT:  Any objection?

2          MR. TYSON:  No objections, Your Honor.

3          THE COURT:  They're admitted.

4          MR. TROMBLAY:  All right.

5      (Government's Exhibits 2 and 3 are received into

6  evidence.)

7  BY MR. TROMBLAY:

8  Q    Do you have any confidence whether or not Mr. Jefferson

9  continues to be a good candidate for release and supervision

10 by Pretrial Services?

11 A    Based upon his conduct since he's been released, which

12 has been a short time, I have serious concerns.

13 Q    Okay.  So he's released on June the 5th, and yet all of

14 these incidents that you have just described all occurred

15 within a week of his release?

16 A    Yes.  Correct.

17 Q    Okay.

18         MR. TROMBLAY:  Your Honor, that's all the questions

19 I have.

20         THE COURT:  Cross-examination?

21         MR. TYSON:  Thank you, Your Honor.

22                    CROSS-EXAMINATION

23 BY MR. TYSON:

24 Q    Okay.  Officer, when you interviewed Mr. Jefferson

25 initially, was there any recording of that interview?

Levy - Cross                              21

1    A    No, there was not.

2    Q    Okay.  When you met with him in your office and did this

3    subsequent interview, was there a recording made of that

4    interview with him?

5    A    No.

6    Q    Okay.  So your contention that he lied about who he was

7    giving the gun to is only based on your testimony; is that

8    correct?

9    A    It's based on his written statement that he was not

10   truthful, that he crossed out the name of his friend's

11   father.  In my -- in my viewpoint.

12   Q    Isn't it true that he told you he wanted to give it to

13   his friend's father but wasn't sure if he would take it so he

14   asked you to change it to his girlfriend?

15   A    That's incorrect.

16   Q    Okay.  But you don't have any proof otherwise to say that

17   his story is different from -- is the truth or your story is

18   the truth; is that correct?

19   A    My story is what I'm testifying to, and his is apparently

20   different.

21   Q    Okay.

22   A    So, --

23   Q    Do you have a set of contemporaneous notes that you took

24   at the moment you interviewed that indicated that he lied to

25   you?

1  A    In the chronological history in our case management

2  system, it notes that he was not truthful.

3  Q    Okay.  Did you bring that?

4  A    I did not, no.

5  Q    Okay.  Did you take that note chronolo... did you take

6  that note specifically when you spoke to him?  Not

7  afterwards.  Did you take that at the time he was talking to

8  you?

9  A    I was entering in the chronological notes when I was

10  speaking with him, yes.

11  Q    Okay.  And you chose not to bring those?

12  A    Yes.

13  Q    You want the Court to just go off your word?

14  A    Based upon the evidence presented and my word, yes.

15  Q    Okay.  And if you look at Government's Exhibit -- I

16  believe it's 3, the picture of the gun.

17  A    Yes.

18  Q    Can you tell us exactly on this gun where the serial

19  number is?

20  A    I cannot, no.

21  Q    Okay.  Are you familiar with handguns?

22  A    Somewhat familiar.

23  Q    Okay.  But you, even with your familiarity, cannot tell

24  us where the serial number is; is that correct?

25  A    I would not be comfortable telling you based upon this

1   type of gun.

2   Q    Okay.  Are you familiar with Mr. Jefferson's girlfriend's

3   knowledge of guns?

4   A    I am not, no.

5   Q    Okay.  Do you know if she knows where a serial number on

6   a gun is?

7   A    I do not, no.

8   Q    Do you see there's also an attachment on this gun; is

9   that correct?

10  A    Yes.

11  Q    And on the front side of that attachment, there are

12  numbers and letters.  Is that correct?

13  A    Yes.

14  Q    Okay.  Do you know if there are additional letters and

15  numbers on the bottom of that attachment?

16  A    I'm not sure.

17  Q    Okay.  Did you take into account that the girlfriend may

18  have looked at the bottom of this attachment and given you

19  that number, thinking it was the serial number?

20  A    It's possible, but when I ran it, nothing came back.

21  Q    Right.  Because it's an attachment.  When you ran it, you

22  wouldn't get something back.

23  A    Yes.

24  Q    Is that correct?

25  A    Yes.

Levy - Cross                                            24

1   Q    Because you were running through a system looking for a

2   firearm?

3   A    Yes.  And I -- I'll note that I specifically asked her

4   for the serial number of the firearm.

5   Q    Right.  But you just admitted you don't know if she even

6   knows where a serial number is on a handgun.

7   A    Yeah.  I don't know her.  Yes.

8   Q    Did you ever meet with her to view the gun yourself?

9   A    No.

10  Q    Did you ever indicate to him that he should give the gun

11  to another person?  Besides her?

12  A    No.

13  Q    Did you ever request that he turn the gun in to the

14  Court's Clerk?

15  A    No.

16  Q    Did you ever request that he turn the gun in to me, his

17  attorney?

18  A    No.

19  Q    And you're aware Mr. Jefferson is 22 years old, correct?

20  A    Yes.

21  Q    You're aware that he has no priors, no contact with the

22  criminal justice system?

23  A    That's incorrect.

24  Q    Well, no priors?

25  A    He has a prior arrest from 2019 where there was a bond

1    forfeiture and probation violations.

2    Q    Probation violations?  He was on probation?

3    A    Correct.

4    Q    Okay.  Did Mr. Jefferson tell you his parents smoke

5    marijuana?

6    A    He did, yes.

7    Q    Okay.  How long does marijuana, the smell of marijuana

8    stay in a room?

9    A    It depends upon how often it's smoked in that room, the

10   amount.  There's a lot of factors.  I would say, for a

11   recreational user, one to two days, maybe.

12   Q    Okay.  And we're talking about how many people live in

13   Mr. Jefferson's house?

14   A    I believe he indicated three to four.

15   Q    Okay.  Three to four people who smoke marijuana in the

16   same house?  Did you view the entire house?

17   A    Yes, I did.

18   Q    Okay.  Did you see any marijuana in his house?

19   A    Not in plain view, no.

20   Q    Okay.  Now, you could have asked Mr. Jefferson to search

21   his house.  Did you ask him?

22   A    I did not ask him to search his residence.

23   Q    Okay.  Is there something illegal about having a gun

24   holster?

25   A    Not to my knowledge.

1   Q   Was the -- Mr. Jefferson ordered by the Court to turn

2   over all gun holsters and gun accessories?

3   A   All weapons.

4   Q   Weapons.  Not accessories?

5   A   Yes.

6   Q   So the fact that you see accessories in his house is not

7   illegal or a violation of his pretrial conditions?

8   A   Yes.

9   Q   Yes meaning that I'm correct?

10  A   Correct.

11  Q   Okay.  So he was released approximately June 5th?

12  A   On June 5th, yes.

13  Q   Okay.  And he went back into custody this Friday, on the

14  24th?

15  A   Yes.

16  Q   So he was on pretrial supervision about 19 days or so?

17  A   Yes.

18  Q   Okay.  So less than a month?

19  A   Yes.

20  Q   Okay.  And without concrete proof, you want to revoke his

21  pretrial release?

22  A   I believe there is enough evidence at this time to revoke

23  his pretrial supervision.

24  Q   Okay.  You showed up at the house unannounced.  Is that

25  correct?

1    A    On June 9, 2023.

2    Q    Yes, sir.

3    A    Yes.

4    Q    And you found it strange that it took four to five

5    minutes for the door to be opened?

6    A    I did, yes.

7    Q    Okay.  Have you ever showed up at -- or, have you ever

8    had someone show up at your house unannounced?

9    A    Probably.

10    Q    Do you think there's a multitude of reasons why people

11    would not immediately open a door when someone shows up to

12    their house unannounced?

13    A    There is, yes.

14    Q    You took a drug test of Mr. Jefferson, correct?

15    A    Yes.

16    Q    Okay.  Is it my understanding, am I correct that if you

17    test someone and they indicate positive for marijuana, you

18    can test them again and you can see if that level of

19    marijuana is the same on a subsequent test?

20    A    We would get the results that he tested positive, and

21    then if we wanted to do an interpretation that would be an

22    additional test.

23    Q    Okay.  So, Mr. Jefferson indicated he smoked marijuana

24    before court, when he was not under court order; is that

25    correct?

Levy - Cross                                            28

1   A    Yes.  After he was served a summons, yes.

2   Q    Yeah.  But he wasn't under court order.  He was -- he was

3   told to come to court.  He wasn't arrested.  Right?

4   A    Correct.

5   Q    He wasn't under court supervision?

6   A    Yes.

7   Q    All right.  So, before court he smoked marijuana?

8   A    Yes.

9   Q    Okay.  After court, you seem to think he was smoking

10  marijuana.

11  A    He -- could you repeat that?

12  Q    Well, you said you went into his home, there was a strong

13  odor of marijuana in his room.  So you seem to be indicating

14  to the Court that you think he was smoking marijuana.

15  A    Yes.

16  Q    Okay.  You have the authority, you have the tools, to

17  test that theory, correct?

18  A    Through drug testing, yes.

19  Q    Yeah.  Did you do so?

20  A    On that date?  No, because --

21  Q    Ever?

22  A    Yes, he was drug tested, and it came back positive.

23  Q    Subsequent to that test, then you went to his home.  You

24  believed he was smoking marijuana.  After that, you came to

25  the Court and put these -- put your version of the facts

1   toward the Court.  You had a chance to test that version of

2   the facts.  Did you test that version of the facts by taking

3   a subsequent drug test of Mr. Jefferson?

4   A    We did not because we were petitioning the Court --

5   Q    I didn't ask you why.

6   A    Okay.

7   Q    I just asked you, did you do it?

8   A    No.

9   Q    Did Mr. Jefferson's pretrial order say anything about

10  turning in any drug paraphernalia?

11  A    No.

12  Q    Okay.  Did you take pictures of his drug paraphernalia?

13  A    I did not, no.

14  Q    Okay.  As far as the picture of the gun, now, you -- did

15  you give Mr. Jefferson a timeline on when he had to have the

16  gun turned over to Ms. Mariah?

17  A    I told him after the intake to -- to surrender the weapon

18  immediately.

19  Q    Immediately?

20  A    Yes.

21  Q    And what does immediately mean to you?

22  A    As soon as possible.

23  Q    Okay.  Did you clarify that with him?

24  A    Can you --

25  Q    As far as what your expectation of the date or time you

1    expected to have him transfer the gun to Ms. Mariah?

2    A    Immediately and as soon as possible, and he voiced no

3    concerns with that.

4    Q    Okay.  That wasn't my question, though.  My question was,

5    did you -- did you clarify a date or a time when you wanted

6    Mr. Jefferson to turn the gun over?

7    A    No.

8    Q    Okay.  And you -- you're indicating that the picture of

9    the gun you received was taken at Mr. Jefferson's home a day

10   or two after you met with him.  Is that correct?

11   A    Yes.

12   Q    Okay.  And you think that's a problem?

13   A    I do, yes.

14   Q    Okay.  But you didn't give Mr. Jefferson a strict

15   timeline when he had to turn the gun over?

16   A    I did not give him a set date.

17   Q    Okay.  So if it took him two days to turn it over, you

18   now indicate that's a problem?

19   A    It is a problem, yes.

20   Q    But you didn't give him a deadline.  You went off of his

21   -- his interpretation of what immediately or as soon as

22   possible meant to him.  Is that correct?

23   A    Yes.

24   Q    You didn't give him a strong deadline?

25   A    I did not give him a date.

1    Q    But now you have a problem with it being two days later?

2    A    It is a problem, yes.

3    Q    Okay.  Now, the fact that his girlfriend took the picture

4    at his home of the gun is a problem to you as well?

5    A    Yes.

6    Q    Why is that a problem to you?

7    A    Because it reflects the gun is still at his residence and

8    possibly in his possession.

9    Q    On June 8th?

10   A    Yes.

11   Q    Okay.  You didn't ask for the picture until, what, June

12   15th?

13   A    Yes.

14   Q    Okay.  So the fact that he -- the gun is in his residence

15   on June 8th, the girlfriend takes a picture, and you ask for

16   the picture on the 15th, you're interpreting that as Mr.

17   Jefferson can have the gun on June 15th.  Is that correct?

18   A    I don't understand your question.

19   Q    Well, your premise of -- your problem with the picture is

20   based on the fact that it was taken at Mr. Jefferson's house.

21   That's my understanding.

22   A    The problem also is that she was not able to take a

23   picture of it on that date verifying she was in possession of

24   it at that date and time, the 15th.

25   Q    You didn't ask her for that.  That's not -- that wasn't

1    your testimony.  Your testimony was not, I want you to take a

2    picture right now of that gun.  That's not what you told her.

3    You said, give me a picture of the gun.  Is that correct?

4    A    It is correct.

5    Q    Okay.  So you can't -- you can't move the goalpost.  You

6    understand that, right?

7    A    No, I don't.

8    Q    Well, meaning that if you wanted a picture of the gun

9    right then, right there, you could have asked her

10   specifically:  Ma'am, I need you to take a picture of the gun

11   right now, where it is, and send that to me.  You did not do

12   that, correct?

13   A    I would have no reason to believe she would have a

14   picture of Mr. Jefferson's gun saved on her phone.

15   Q    That wasn't my question.

16   A    Okay.

17   Q    Did you hear the question?

18   A    I'm sorry?

19   Q    Did you hear the question?

20   A    I still don't understand it.

21   Q    Okay.  You had the ability to ask her to take a picture

22   of the gun right then, that date, and send it to you.

23   Correct?

24   A    Yes.

25   Q    You did not do that?

Levy - Cross/Redirect/Recross                33

1   A    Yes.

2   Q    Yes, you did not do that?

3   A    I did not ask her for a picture of the gun on that

4   specific date in writing, yes.

5   Q    Okay.

6            MR. TYSON:  Can I have one moment, Your Honor?

7            THE COURT:  Yes.

8        (Pause.)

9            MR. TYSON:  I have no further questions, Your Honor.

10            THE COURT:  Any redirect?

11            MR. TROMBLAY:  Just one question.

12                        REDIRECT EXAMINATION

13   BY MR. TROMBLAY:

14   Q    Mr. Levy, do you know where that gun is today?

15   A    I do not, no.

16            MR. TROMBLAY:  That's all I have.

17            MR. TYSON:  May I recross, Your Honor?

18                        RECROSS-EXAMINATION

19   BY MR. TYSON:

20   Q    Mr. Levy, did you indicate to Ms. Mariah that she should

21   bring you the gun?

22   A    No, I did not.

23   Q    When is the last time you spoke to Ms. Mariah?

24   A    On Friday, when he was arrested.

25   Q    Okay.  Did you ask her where the gun was on Friday, when

1    he was arrested?

2    A    No, I did not.

3    Q    Did you ask her this morning, where is the gun?

4    A    I did not, no.

5              MR. TYSON:  Thank you.

6              THE COURT:  Sir, you may step down.

7         (The witness steps down.)

8              MR. TROMBLAY:  That's all the evidence the

9    Government has.

10             THE COURT:  Mr. Tyson?

11             MR. TYSON:  We have no witnesses or evidence, Your

12   Honor.

13             THE COURT:  All right.  Then both sides rest and

14   close, then?

15             MR. TYSON:  Yes, Your Honor.

16             THE COURT:  Would either side like to be heard in

17   argument?

18             MR. TROMBLAY:  Does the Court wish argument from the

19   Government?

20             THE COURT:  It's up to you.

21             MR. TROMBLAY:  Yes.  Your Honor, I'll be as brief

22   and terse as I can.  As the probation officer said, he has

23   zero confidence in this man or he has no confidence in this

24   man that he can continue to supervise him on the conditions

25   of release.

1      He has told lies about the firearm.  This is, of course,

2  a firearm case involving firearms.  He first said that he had

3  already surrendered the gun, when in fact he then changed his

4  story and then he indicated that he hadn't.  And we see the

5  paperwork; he indicated that he had actually surrendered the

6  gun the day before his intake.

7      He then -- the probation officer gave a surprise

8  inspection at his home.  His bedroom reeked of marijuana.

9  The probation officer said that there was drug paraphernalia

10  in plain view.  There was marijuana -- I'm going to loosely

11  call them roaches -- on the floor.  There was -- there were

12  firearms accessories in plain view.

13      Mr. Jefferson changed his story.  He first indicated that

14  this was -- that the smell of marijuana, when confronted, was

15  old, and then he later changed it and said, well, this is

16  because of my family members.  Of course, it's all emanating

17  from his room.

18      And of course, that's also considering the fact that it

19  took him four or five minutes to open the door.

20      I'm not going to belabor all of the evidence jot for jot,

21  but I believe that there is sufficient evidence that would

22  indicate to the Court that this -- that Mr. Jefferson is no

23  longer a candidate for conditions of release.  In fact, in

24  2019, he was arrested on a theft charge, and there were

25  probation violations there as well.  And considering the --

1   and all of this conduct has occurred within a week of you

2   releasing him on conditions of release.  And we would ask

3   that you revoke his conditions of release and remand him to

4   the custody of the United States Marshals until his case is

5   disposed of.

6           THE COURT:  May I have the exhibits, Mr. Tromblay?

7           MR. TROMBLAY:  I believe -- do you know where the

8   exhibits are?  Did you take them with you?

9       (Pause.)

10          THE COURT:  Thank you.  Mr. Tyson?

11          MR. TYSON:  Thank you, Your Honor.  Your Honor, Mr.

12  Jefferson's release should not be taken into account simply

13  because whether or not the probation officer has confidence

14  in him.  Your Honor, Mr. Jefferson's pretrial release should

15  only be revoked if the Government had presented concrete

16  evidence that Mr. Jefferson had violated his pretrial

17  release.

18      Your Honor, we have -- the indication, the main

19  indication and point of this motion is that the Government

20  believes that Mr. Jefferson has not released this firearm to

21  Ms. Mariah.  Okay.  The Government's officer, the Pretrial

22  officer, never asked Ms. Mariah any questions about whether

23  or not -- where the serial number was, if she knew where the

24  serial number to a gun was, or anything of that nature.  As

25  you can see from the exhibit, there is an attachment, at

1   least one attachment on the gun.  I believe there's a second

2   one, some type of optical attachment as well.  There is some

3   type of flashlight or rigging attachment to the gun.  The

4   probation officer doesn't know if Ms. Mariah gave him that

5   number or what number of what accessory she actually gave to

6   him.

7          THE COURT:  And Mr. Tyson, that might give me some

8   pause except for the fact that the testimony was that she

9   immediately gave the serial number, that she was expecting to

10  give the serial number.

11         MR. TYSON:  Yes, Your Honor, because Mr. Jefferson,

12  her boyfriend, had communicated to her, yes, they're going to

13  check up on you, because the probation officer had already

14  told him --

15         THE COURT:  That's what I assumed, too.

16         MR. TYSON:  Yeah.  So to be ready, to be ready --

17         THE COURT:  Right.

18         MR. TYSON:  -- when this time comes.  But the fact

19  of the matter is, even if he told her to be ready, we don't

20  know if Mr. Jefferson knows where a serial number is on a

21  gun.

22         THE COURT:  Well, --

23         MR. TYSON:  Just because he purchased a gun.

24         THE COURT:  Well, --

25         MR. TYSON:  So, with that being said, Your Honor, if

1    the testimony had been he told Ms. Mariah, this is where the

2    serial number is, or showed it to her or taught her that, and

3    he knew where the serial number was as well, this would be a

4    different case or a different story.

5        The fact of the matter is we've got two children, and

6    they're being asked --

7            THE COURT:  Well, this person sitting in front of

8    me, the Defendant, is not a child.  He might be a young man,

9    but he is not a child.  So, --

10           MR. TYSON:  He's -- he's very young.

11           THE COURT:  And, well, --

12           MR. TYSON:  Twenty-two, Your Honor.  His brain has

13   not even fully developed.  Scientific.

14           THE COURT:  Okay.

15           MR. TYSON:  So, the fact of the matter, Your Honor,

16   could they have done a better job of communicating this

17   information to the Pretrial officer?  Definitely.  Could the

18   Pretrial officer have been a little clearer on his directions

19   to Mr. Jefferson on when to turn over the gun and who is an

20   appropriate person to turn it over to?

21           THE COURT:  What about the fact that I told him when

22   I ordered him --

23           MR. TYSON:  Uh-huh.

24           THE COURT:  -- that he couldn't have any weapons in

25   his home?  And because he already said --

1          MR. TYSON:  Yeah.

2          THE COURT:  -- he had a weapon in his home, that he

3    needed to get rid of it right away?  You think I should have

4    told him, And I mean by such-and-such a date, such-and-such a

5    time?  You think he didn't know?

6          MR. TYSON:  I think -- I think young people, a 22-

7    year-old, see time differently than the rest of us.

8          THE COURT:  Well, that might have some traction,

9    too, if it wasn't for the case that the actual form he signed

10   said any and all weapons in my possession have been

11   surrendered as follows, as if already happened.

12         MR. TYSON:  Right.  I mean, --

13         THE COURT:  And it was a lie.

14         MR. TYSON:  Well, this is the problem, Your Honor,

15   with that.  He filled out the same form for Mariah the same

16   day.  So I think that's a -- that's a problem with their --

17         THE COURT:  He didn't fill it out.  He changed his

18   mind because he had lied.

19         MR. TYSON:  Well, this is the thing.  He filled out

20   the same form for Ms. Mariah.  So the probation officer knew

21   he hadn't given her the gun at that moment he filled out that

22   form.

23         THE COURT:  After he admitted he had lied.

24         MR. TYSON:  Well, that's his version.  Mr. Jefferson

25   --

1          THE COURT:  I'm going to tell you to cut it short,

2    that I find his version very credible.

3          MR. TYSON:  Fair enough.

4          THE COURT:  First of all, he has no reason to lie

5    about it.  He supervises hundreds of people, and has.  He has

6    no reason to decide in Mr. Jefferson's case -- because

7    Pretrial recommended that he be released.  I had my

8    questions, --

9          MR. TYSON:  Correct.

10         THE COURT:  -- but they recommended he be released.

11         MR. TYSON:  Uh-huh.

12         THE COURT:  And he had no reason to make that up.

13   Mr. Jefferson, on the other hand, has every reason to make up

14   a story to try to fit what he did.

15         MR. TYSON:  Yes, Your Honor.  And I understand

16   exactly your position.  But if you look at --

17         THE COURT:  I understand your position, too.

18         MR. TYSON:  -- it, people often say there's two --

19   there's two versions and there's the truth.  The fact of the

20   matter is, we have a conversation going back and forth.  He

21   might have thought he said, I'm going to give it to John's

22   daddy, and Mr. Pretrial Officer may have heard, I gave it --

23   I'm giving it to John -- I gave it to John's daddy.

24         THE COURT:  It's not even a matter of hearing it.

25   He actually wrote down and signed --

1            MR. TYSON:  Yes.

2            THE COURT:  -- that he had already surrendered it.

3            MR. TYSON:  But he did the same thing for Ms. Mariah

4    in the same meeting.  He signed saying, I gave it to her.

5            THE COURT:  Yes.

6            MR. TYSON:  That's their form.

7            THE COURT:  Because he lied.

8            MR. TYSON:  No, no, no, no.  That's an indication of

9    this is what I'm going to do, but the form doesn't reflect

10   that.  The form should say, I am going to give this gun to *x*,

11   or I have given this gun to *x*.  So it's not Mr. Jefferson's

12   fault that Pretrial's form is not up to date.

13           THE COURT:  Okay.

14           MR. TYSON:  But I think it should have two spaces.

15           THE COURT:  Well, it's Mr. Jefferson's fault that he

16   didn't do what I ordered him to do and get rid of the gun

17   that was in his home.

18           MR. TYSON:  Well, you said as soon as possible, Your

19   Honor, or did you say immediately?  I -- I'm -- on your

20   order?

21           THE COURT:  It says, he shall not possess.

22           MR. TYSON:  Okay.

23           THE COURT:  And then, because the Pretrial Services

24   report said he had a gun, --

25           MR. TYSON:  Right.

1          THE COURT:  -- you know.

2          MR. TYSON:  Yes.

3          THE COURT:  And, I mean, it's like, You have a

4    weapon, you need to get rid of it.  You are not to possess.

5    So, --

6          MR. TYSON:  Right.  Your Honor, with that being

7    said, I think with defendants under 30 years old we should be

8    more clear on when exactly we expect them to turn in their

9    weapons.

10         THE COURT:  I think when you put yourself in the

11   position of being indicted for a federal felony case,

12   especially a weapons one, and I go through with you, Do you

13   understand the order setting of conditions of release, are

14   you agreeing to abide by those conditions, and you tell me

15   yes, then I should be able to take your word for it.  That's

16   what I think.

17         MR. TYSON:  Fair.

18         THE COURT:  But I understand your position.  You go

19   right ahead, Mr. Tyson.

20         MR. TYSON:  Thank you.  Well, Your Honor, with that

21   being said, again, at the end of the day, there are multiple

22   alternatives here.  He can turn the gun in to the Court.  He

23   can turn the gun in to me.  There is other ways we can assure

24   that this gun is accounted for.  As of this moment, Pretrial

25   doesn't know where the gun is.  If that -- if it such a

1   concern, then we should find out where the gun is, we should

2   have Mr. Jefferson released, and have him turn the gun in

3   himself.

4       So he's been on pretrial supervision less than a month.

5   More or less 19 days.  Twenty-two years old.  Could he have

6   done better?  Yes.  Has he got to spend a weekend in jail to

7   run this through his head and think about ways he could have

8   handled this situation better?  Yes.  Does he need to sit in

9   jail for months as his case proceeds in order to learn his

10  lesson?  I think not, Your Honor.

11      I think Mr. Jefferson should be re-released and given an

12  opportunity to surrender his firearm within 48 hours, either

13  to the Court or to my office, and allowed to continue on his

14  pretrial release.

15          THE COURT:  Thank you, Mr. Tyson.

16          MR. TYSON:  Thank you.

17          THE COURT:  Mr. Jefferson, let me again reiterate

18  that I find credible the testimony of the Pretrial Services

19  officer here, for the reasons that I told you mainly.  And

20  the fact is, I do know him.

21      In addition to that, you were never, in my estimation, a

22  good candidate for release.  But because of your age and

23  because Pretrial Services recommended that you be released

24  and the Government agreed with them, I released you on

25  certain conditions.  And those conditions weren't just

1   something I willy-nilly decided.  They, I believed, were

2   necessary to reasonably assure your appearance as required

3   and the safety of the community or other persons.

4        You know, you had in your past that you had a bond

5   violation.  You had a probation violation.  It's not like it

6   was way back there.  This is just a couple of years ago that

7   this occurred.  And so it was very concerning to me.

8        When I issue orders like this and I send Pretrial

9   Services officers out in a way, because I know they're going

10  to have to go visit these people, it's so important to me

11  that they are not walking into residences where people have

12  firearms.  Can you see what a danger to them that might be,

13  having to show up at somebody's house and not knowing if they

14  have firearms?

15       And so that's, you know, that's important.  And in this

16  situation, the credible evidence just establishes that from

17  the get-go you just started lying.  You just started lying,

18  is what I believe and what I believe the evidence showed.

19       Let me tell you what the standard here is.  There are two

20  standards.  But the main standard and the reason that I'm

21  going to revoke your pretrial release is that I have to find

22  that you are likely to abide by the conditions that I impose.

23  No, you don't tell me you will now.  See, Mr. Tyson said a

24  whole bunch of ways you could have taken care of your

25  business.  There were a whole bunch of ways you could have

1  taken care of your business.  But right out of the chute, you

2  didn't.  Right out of the chute, you started lying.  You lied

3  until you were caught.  You lied again until you were caught.

4  Under no circumstances there's no way that someone as old as

5  me can believe that you're likely to abide by the conditions

6  that I impose.  And so I do find that you're not likely to

7  abide by the conditions that I impose based on your history

8  of not doing that right out of the chute.  I am revoking the

9  order setting conditions of release in your case and ordering

10  that you be detained.

11      Is there anything else, then, we need to take up in Mr.

12  Jefferson's case today?

13          MR. TROMBLAY:  No, ma'am.

14          MR. TYSON:  Nothing further, Your Honor.

15          THE COURT:  Mr. Jefferson, that concludes your

16  hearing, sir.  You're remanded to the custody of the U.S.

17  Marshal.  Good luck to you.  The attorneys are excused.

18          MR. TYSON:  Thank you, Your Honor.

19      (Proceedings concluded at 11:01 a.m.)

20                          --oOo--

21                        CERTIFICATE

22      I certify that the foregoing is a correct transcript from the
   electronic sound recording of the proceedings in the above-entitled matter.

23   /s/ Kathy Rehling                          07/31/2023

24
   _____        _____
25
   Kathy Rehling, CETD-444                         Date
   Certified Electronic Court Transcriber

                              INDEX

1

2    PROCEEDINGS                                                    2

3    WITNESSES

4    Government's Witnesses      Direct  Cross  Redirect  Recross

5      Sam Levy                    3     20      33        33

6    EXHIBITS

7    Government's Exhibit 1                          Received  9
     Government's Exhibits 2 and 3                   Received 20
8    RULINGS                                                    43

9    END OF PROCEEDINGS                                         45

10   INDEX                                                      46

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25